RCV'D - USDC COLA SC
AUG 3 '26 AM11:37

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| BOBBIE DAMERON,<br><br>    Plaintiff,<br><br>v.<br><br>CHARTER COMMUNICATIONS, LLC,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 3:26-cv-_____<br><br>COMPLAINT<br>(Jury Trial Demanded) |

Plaintiff Bobbie Dameron, appearing pro se, complaining of Defendant Charter Communications, LLC, alleges as follows:

**PRELIMINARY STATEMENT**

1. This is an action for disability discrimination, retaliation, and unpaid wages under the Americans with Disabilities Act and the South Carolina Payment of Wages Act. Before the merits can be reached in any forum, there is a threshold question that belongs to this Court: what remains of Defendant's claimed right to arbitrate after Defendant's own obstruction of the arbitration Plaintiff commenced, and whether any enforceable agreement to arbitrate was ever formed at all. The facts bearing on that question are brief, documented, and not in dispute, and they leave only two conclusions open, either of which ends Defendant's arbitration defense: Defendant forfeited whatever right to arbitrate it ever held by obstructing the very arbitration it demanded, or no valid arbitration agreement was ever formed at all. Plaintiff seeks trial by jury.

2. Defendant told the Equal Employment Opportunity Commission in writing, through counsel, that there is no question that Plaintiff's claims fall within the scope of its Mutual Arbitration Agreement, that any proceeding on the merits or for damages is subject to arbitration, and that Defendant intends to fully assert its rights under that agreement (Exhibit A). Defendant deployed arbitration as a shield before a federal agency: whatever the EEOC concluded about Plaintiff's charge, Defendant announced, the merits and any damages belonged to arbitration and nowhere else. Plaintiff took Defendant at its word. Facing an August 3, 2026 filing deadline, she

filed a Demand for Arbitration with the American Arbitration Association on July 23, 2026, which was assigned Case No. 01-26-0004-5320 (Exhibit B), and served Defendant and its counsel with the filing by certified mail. Defendant's counsel responded by demanding in writing that Plaintiff withdraw her arbitration filing, asserting that Plaintiff must first complete Defendant's internal Solution Channel process so that Defendant itself can review whether her claims are eligible for arbitration, and stating that counsel would ask the AAA to dismiss the case (Exhibit C). Plaintiff did exactly what Defendant said was required. Defendant is the party that stopped arbitration from happening.

3. That demand contradicts federal law and Defendant's own contract. The Supreme Court has held that the Federal Arbitration Act supersedes prerequisites that lodge threshold decisions in any forum other than arbitration. Preston v. Ferrer, 552 U.S. 346 (2008). The Supreme Court has further held that where a contract delegates questions of arbitrability to the arbitrator, that delegation must be enforced as written, and no party may substitute its own judgment for the arbitrator's. Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524 (2019). Defendant, an interested party, seized for itself a question that its own contract and federal law place with the arbitrator alone. Defendant's own agreement (Exhibit D) provides that the arbitrator has sole authority over arbitrability, that the agreement controls over the Solution Channel guidelines, and that a party's refusal to submit to arbitration is a material breach obligating that party to pay the other side's costs of compelling arbitration. By demanding withdrawal of a filed arbitration, arrogating arbitrability to itself, and threatening to have the AAA dismiss the case, Defendant materially breached the agreement under its own Section K and acted inconsistently with the right to arbitrate, forfeiting that right under Morgan v. Sundance, Inc., 596 U.S. 411 (2022), with no showing of prejudice required.

4. What Charter presents to its employees in place of the Agreement is a program it calls Solution Channel, documented in a roughly thirty page illustrated guidelines booklet (Exhibit N). The Guidelines are written to make Charter's internal portal appear to be the only door to arbitration. They contain no instruction that an employee may proceed to the American Arbitration

Association, no AAA filing information for claimants, and no disclosure that the arbitrability of a claim belongs solely to the arbitrator. Instead, the Guidelines describe a process, quoted step by step in Section III.B below, in which the employee submits her claim to Charter, Charter decides whether the claim is arbitrable, Charter conducts its own review, Charter issues its decision, the employee notifies Charter whether she wishes to proceed, and the AAA is notified by Charter, or is not. At every step, the entity that controls whether arbitration begins is the respondent. An employee reading this document reasonably concludes that she must ask Charter's permission to arbitrate claims against Charter. That is what the document was written to make her conclude, and it is false.

5. It is false not merely because Charter's own Agreement assigns arbitrability solely to the arbitrator and provides that the Agreement controls over the Guidelines (Exhibit D, Sections B.3, I.1, and M). It is false because federal law forbids the arrangement. The Federal Arbitration Act, 9 U.S.C. Sections 2 and 4, requires that arbitration agreements be enforced according to their terms; Preston holds that prerequisites lodging threshold decisions in any forum other than arbitration are superseded; and Henry Schein holds that a delegation of arbitrability to the arbitrator forbids the parties from deciding it for themselves. Charter cannot be the judge of whether claims against Charter may be arbitrated. The Solution Channel review process, as Charter administers it, is not an intake convenience. It is an unlawful gate: the respondent screening its opponent's access to a forum that the law and the contract both place beyond the respondent's control, dressed in procedural language chosen to keep employees from recognizing the gate for what it is.

6. Should the Court reach it, formation is disputed as well. The only assent Defendant has ever produced is a record that Plaintiff selected an agreement response beside a one paragraph statement on a page of her April 2019 online job application, a page that also collected her veteran status for federal reporting purposes (Exhibit M). Nothing in the record shows that the Mutual Arbitration Agreement itself, a multi page contract with lettered sections and a class action waiver, was displayed, linked, delivered, or otherwise made available to Plaintiff, and Plaintiff alleges it

was not. Under South Carolina law, an acknowledgment of a document never shown does not form a contract on that document's terms. Lampo v. Amedisys Holding, LLC, No. 28265 (S.C. 2025).

7. The gate has a second character in this case. The claims Plaintiff sought to arbitrate are disability claims, and the employee Charter turned away at the door is a disabled employee with an open EEOC charge, proceeding pro se against a limitations deadline that Defendant's counsel could count as easily as she could. Blocking a disabled employee's access to the only forum the employer itself declared available, in response to her assertion of rights under the Americans with Disabilities Act, is not just contract gamesmanship. It is coercion, intimidation, threat, and interference with the exercise and enjoyment of ADA rights within the meaning of 42 U.S.C. Section 12203(b), and it fits the four year pattern alleged below, in which every process Defendant controls has been administered to exhaust the disabled employee rather than to accommodate her.

8. Plaintiff's protective filing was not an admission. She filed with the AAA under deadline pressure because Defendant insisted arbitration was mandatory, and her Demand for Arbitration expressly stated that she does not agree that Charter properly presented the arbitration agreement to her and that she reserves the right to raise that challenge. Now that Defendant has obstructed even the arbitration it demanded, Plaintiff raises that challenge squarely. There is no inconsistency in her position: she complied with the agreement Defendant declared mandatory, and Defendant's own obstruction is what has put the agreement's validity in issue. A party that drafts a document, tells a federal agency it is binding beyond question, and then blocks the very forum the document names has demonstrated that the instrument operates one way only, binding the employee and never the company.

9. Plaintiff accordingly asks the Court to resolve the arbitration question at the threshold: to declare that Defendant materially breached and forfeited the agreement by obstructing the arbitration Plaintiff commenced; or that no arbitration agreement was ever formed with Plaintiff; or that the agreement is unconscionable and unenforceable; or, in the final alternative, if the agreement is enforced, to order under 9 U.S.C. Section 4 that AAA Case No. 01-26-0004-5320 proceed forthwith, free of any internal gatekeeping, at Defendant's expense as its own contract

provides. Plaintiff seeks trial by jury, not arbitration. The final alternative is pleaded only because the Federal Rules permit alternative demands, and because if Defendant somehow salvages the agreement it forfeited, the salvage must come at Defendant's expense under Defendant's own Section K. Plaintiff further seeks relief on the merits of her ADA claims, including disparate treatment, disparate impact, failure to accommodate, unlawful medical inquiries, and retaliation, and her South Carolina Payment of Wages Act claim, in whichever forum survives that determination.

## I. PARTIES, JURISDICTION, AND VENUE

10. Plaintiff Bobbie Dameron is a citizen and resident of Lexington County, South Carolina, residing at 910 Holland Avenue, Cayce, South Carolina 29033. She has been employed by Defendant as a Residential Sales Chat Representative since May 24, 2019, and remains employed by Defendant.

11. Defendant Charter Communications, LLC is a limited liability company doing business in South Carolina, with a place of business at 3347 Platt Springs Road, West Columbia, South Carolina 29170, where Plaintiff was based.

12. This Court has subject matter jurisdiction under 28 U.S.C. Section 1331 because this action arises under the Americans with Disabilities Act, 42 U.S.C. Section 12101 et seq., and under the Federal Arbitration Act, 9 U.S.C. Sections 1 through 16, and has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. Section 1367 because they arise from the same case or controversy.

13. Venue is proper in this District and Division under 28 U.S.C. Section 1391(b) because Defendant maintains a place of business here and a substantial part of the events or omissions giving rise to the claims occurred here.

## II. EXHAUSTION OF ADMINISTRATIVE REMEDIES

14. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on April 4, 2025, Charge No. 436-2025-00543, alleging disability discrimination and retaliation. The Charge was dual filed with the South Carolina Human Affairs Commission.

15. On May 5, 2026, the EEOC issued Plaintiff a Determination and Notice of Rights advising Plaintiff of her right to sue within 90 days of receipt. A copy is attached as Exhibit E.

16. Plaintiff received the Notice of Rights on May 5, 2026, the day it issued. This action is filed within 90 days of Plaintiff's receipt of the Notice of Rights (Exhibit E) and is timely.

### III. FACTUAL ALLEGATIONS

**A. No Valid Arbitration Agreement Was Ever Formed, and the Purported Agreement Is Unconscionable**

17. Defendant asserts that Plaintiff is bound by a document titled Mutual Arbitration Agreement, version dated September 25, 2017, associated with Defendant's internal dispute program called Solution Channel. A copy is attached as Exhibit D.

18. Defendant's only evidence of Plaintiff's assent is a record that she registered an agreement response during her online job application on April 9, 2019. An excerpt of that application record is attached as Exhibit M. The page presented a single paragraph stating that Charter requires that all legal disputes involving employment with Charter or application for employment with Charter be resolved through binding arbitration, that Charter believes arbitration is a fair and efficient way to resolve these disputes, that any person who submits an application for consideration by Charter agrees to be bound by the terms of Charter's Mutual Arbitration Agreement, and that by submitting an application for consideration the applicant is agreeing to be bound by the Agreement. The recorded response is the words I agree, entered on the same application page that collected Plaintiff's veteran status for VEVRAA reporting purposes, and logged by an automated submission system. A click record proves a click. It does not prove that the five page agreement was ever displayed, presented, linked, or made available to Plaintiff, and Plaintiff does not believe it was. What she recalls is that one paragraph summary. The record

contains no hyperlink to the Agreement, no page displaying its terms, no signed agreement, no acknowledgment of the full document, and no record that the full document was ever shown to her. Plaintiff demands that Defendant prove the full agreement was actually presented to her, and Plaintiff alleges on information and belief that no such proof exists. The party seeking to compel arbitration bears the burden of proving that a valid agreement to arbitrate was formed.

19. Under South Carolina law, which governs contract formation here, arbitration agreements are ordinary contracts requiring actual mutual assent, there is no policy favoring arbitration, and silence, inaction, continued employment, or an acknowledgment click does not by itself constitute acceptance of terms never shown. The Supreme Court of South Carolina recently refused to find an arbitration agreement formed where the employer relied on an employee's acknowledgment and failure to opt out rather than proof of actual assent to the agreement's terms. Lampo v. Amedisys Holding, LLC, No. 28265 (S.C. 2025); see Morgan v. Sundance, Inc., 596 U.S. 411 (2022).

20. Defendant's own documents compound the formation problem, because Defendant maintains multiple versions of the agreement and the program and has never established which version, if any, Plaintiff assented to. Defendant asserts a Mutual Arbitration Agreement version dated September 25, 2017 (Exhibit D). The Solution Channel Guidelines that Charter currently publishes to employees carry a version date of October 21, 2024 (Exhibit N), append a Mutual Arbitration Agreement with materially different section lettering, and state that the 2024 agreement is effective as of October 21, 2024 for any individual actively employed on that date who has not opted out of Solution Channel. Plaintiff never consented to the 2024 version, was never asked to consent to it, and was never offered any opportunity to opt out of it. An employer that unilaterally revises the terms of a purported contract, republishes it under new section letters, and deems employees bound by continued employment is not enforcing a bargain. Under Lampo, continued employment and silence do not constitute assent to terms never agreed.

21. The agreement is also unconscionable on its face. It is a contract of adhesion, presented on a take it or leave it basis as a condition of even applying for employment, with no opportunity to

negotiate. The FAA itself preserves these defenses: 9 U.S.C. Section 2 makes arbitration agreements enforceable save upon such grounds as exist at law or in equity for the revocation of any contract, which includes lack of formation and unconscionability.

22. The Supreme Court of California has already examined this same Charter agreement and held that it contains substantively unconscionable provisions: it lacks mutuality because it channels into arbitration virtually every claim an employee would typically bring, including discrimination, retaliation, accommodation, and wage claims, while excluding categories of claims an employer would typically bring, such as intellectual property and trade secret claims; it shortens the limitations period for employee claims; and its fee provision creates the potential for unlawful awards of attorney fees against employees. Ramirez v. Charter Communications, Inc., 16 Cal.5th 478 (2024). On remand, the Court of Appeal declined to sever the unconscionable provisions, finding the agreement's central purpose tainted with illegality and its terms reflecting a systematic effort to impose arbitration in a manner favoring the employer, and affirmed the refusal to enforce the agreement at all.

23. The agreement (Exhibit D) provides in Section B.3 that all disputes related to the arbitrability of any claim are themselves covered claims for the arbitrator, and in Section I.1 that the arbitrator has the sole authority to determine whether a particular claim or controversy is arbitrable.

24. The agreement provides in Section K (Exhibit D) that the failure or refusal of either party to submit to arbitration as required by the agreement constitutes a material breach of the agreement, and that a party that resists arbitration must pay the other party all costs, fees, and expenses incurred in compelling arbitration.

25. The agreement provides in Section M that in the event of a conflict between the agreement and the Solution Channel Program Guidelines, the terms of the agreement control, and in Section R that the agreement is governed by the Federal Arbitration Act.

26. The agreement is one sided in operation as well as on paper. Section F requires the employee, and only the employee, to first submit a claim through Charter's Solution Channel

website, and Defendant construes that process to give itself the power to review whether an employee's claims are eligible for arbitration before any arbitrator is appointed. Arbitration is thus mandatory for the employee but subject to Charter's own gatekeeping discretion, in conflict with Sections B.3 and I.1 of Charter's own document. An arrangement in which one party must arbitrate while the other party decides whether arbitration may occur is illusory and unconscionably one sided, and Defendant's conduct in this case, described below, demonstrates exactly that.

27. Plaintiff's Demand for Arbitration preserved this challenge in writing. It states that Plaintiff is not agreeing that Charter properly presented the arbitration agreement to her and that she reserves the right to raise that issue. Plaintiff's protective filing with the AAA is therefore not an admission that any valid agreement exists.

**B. The Solution Channel Guidelines Are Written to Conceal the Right to Arbitrate and to Install Defendant as Gatekeeper**

28. The Solution Channel Guidelines (Exhibit N) are a roughly thirty page illustrated booklet that presents itself to employees as the complete and exclusive description of how an employment related legal dispute is resolved at Charter. The Mutual Arbitration Agreement, the actual contract, is appended at the back. Plaintiff first encountered the Guidelines, and the Agreement appended to them, years into her employment, when her disputes with Defendant sent her looking; no such booklet and no such agreement was presented to her during her April 2019 application, and what an employee eventually finds when she goes searching says nothing about what she was shown at formation. The Guidelines never inform the employee of the single most important term of that contract for a claimant: that arbitrability belongs solely to the arbitrator, and that Charter has no authority to decide whether an employee's claim may be arbitrated. The subordination clause providing that the Agreement controls over the Guidelines in the event of conflict appears nowhere in the Guidelines' description of the claims process. An employee reading the booklet from front to back is never told that the process it describes yields to the contract behind it.

29. The Guidelines disclose no path to the American Arbitration Association. They identify Charter's portal, www.CharterSolutionChannel.com, described in the Agreement as a site hosted by a third party designated by Charter, as the place where a claim is submitted. They provide no AAA filing instructions, no AAA contact information for claimants, and no statement that a claimant may proceed to the AAA if Charter obstructs or delays. The only route to arbitration the document describes runs through, and stops at, Charter. An employee would have to know more than the employer chose to tell her to discover that the arbitral forum can be reached at all except through her opponent.

30. The Guidelines then describe, step by step, an internal review in which Charter exercises the very powers the law and the Agreement reserve to the arbitrator. Under the heading Internal Claim Review, the Guidelines state that upon receipt the claim will be reviewed to determine whether the claim is covered by Solution Channel, and under the heading Deadlines and Timelines, that Charter will communicate to you whether the claim is subject to Solution Channel and arbitrable within 5 calendar days after the claim is submitted (Exhibit N). Whether a claim is arbitrable is the precise question that Sections B.3 and I.1 of the Agreement, and the Federal Arbitration Act as construed in Henry Schein, place solely with the arbitrator. The Guidelines assign it to Charter, in Charter's sole and unreviewed discretion, on a five day timeline, before any arbitrator exists.

31. The Guidelines state that if the claim is not covered, the claimant will be notified by email and the claim may be referred to Employee Relations, the Charter Ethics Line, or closed (Exhibit N). In plain terms, if Charter decides against arbitrability, the employee's legal claim is diverted into Charter's own internal programs or extinguished. The passive construction, may be referred or closed, conceals the actor. The actor is Charter, the respondent, closing its opponent's claim on its own determination that the claim does not qualify for the forum.

32. The Guidelines state that if the claim is covered, there will be further review of the claim by Charter to determine if resolution is possible prior to arbitration, that Charter will communicate its determination within 45 calendar days after the claim is submitted, and that

Charter's decision following its review will be emailed to the claimant (Exhibit N). The document does not merely permit Charter to propose an informal resolution, which any party may always do. It interposes a forty five day period during which the claim sits with the respondent, styles the output of that period Charter's decision, and conditions the employee's next step upon receiving it.

33. Even after Charter's decision, the employee is never directed to the arbitral forum. The Guidelines provide that the claimant will notify Charter via the portal whether the claimant wishes to proceed to arbitration, that she must indicate whether she wishes to proceed within 15 calendar days after receiving the determination, and that if she does, Charter will contact the AAA to initiate the arbitration proceeding and the AAA will be notified by Charter (Exhibit N). From submission to initiation, the claimant never once communicates with the forum. Charter receives the claim, Charter decides arbitrability, Charter reviews, Charter decides, Charter receives notice of the employee's wishes, and Charter contacts the AAA, or does not. The respondent holds every key to the courthouse door of the only courthouse it says exists.

34. The cumulative message this language delivers to a reasonable employee is unmistakable: arbitration is something Charter grants, on Charter's timeline, after Charter's review, if Charter agrees the claim qualifies. Every element of that message is false as a matter of federal law, under Preston and Henry Schein, and false under Charter's own contract, which gives the arbitrator sole authority over arbitrability and controls over the Guidelines (Exhibit D, Sections B.3, I.1, M). A dispute resolution program that teaches employees they need the respondent's permission to reach a forum the law guarantees them is not a procedure. It functions as a deterrent, and its foreseeable effects, claims abandoned in discouragement, limitations periods run out during internal review, rights surrendered by employees who believed what their employer told them, fall hardest on the employees least equipped to see through it: the sick, the unrepresented, and those, like Plaintiff, who are both.

35. As applied to Plaintiff, the architecture operated exactly as designed until she saw through it. She submitted through Solution Channel because the Guidelines presented it as the only door, and she filed directly with the AAA only after recognizing from her own research, with her

ninety day window closing, that neither the law nor the Agreement gave Defendant the gatekeeping power its response asserted. Defendant's withdrawal demand, described in the next section, confirms that Defendant administers Solution Channel not as an intake convenience but as a gate, and that Defendant will enforce the gate even against claims it told a federal agency must be arbitrated.

**C. Plaintiff's Demand for Arbitration and Defendant's Refusal to Arbitrate**

36. In its June 19, 2025 position statement to the EEOC, attached as Exhibit A, Defendant, through counsel Thompson Coburn LLP, asserted that there is no question that Plaintiff's claims fall within the scope of the arbitration agreement, that any proceeding on the merits or for damages is subject to arbitration, and that Defendant intends to fully assert its rights under the agreement.

37. That position statement was not idle. It was deployed to a federal agency investigating Plaintiff's discrimination charge, and its function was to shield the merits from every forum except arbitration: whatever the EEOC concluded, Defendant announced, the merits and damages belonged to the arbitral forum whose rights Defendant would fully assert. Defendant thus took the benefit of the arbitration agreement, containment of a federal discrimination proceeding, a full year before Plaintiff filed her Demand. Having used the agreement as a shield before the agency, Defendant then turned it into a bar against the employee: when Plaintiff entered the very forum Defendant had invoked, Defendant demanded she leave it. A party may not hold arbitration up when it deflects and knock it down when it binds. That inconsistency is the paradigm of conduct forfeiting the right to arbitrate under Morgan v. Sundance, Inc., 596 U.S. 411 (2022).

38. Facing a deadline of August 3, 2026 to preserve her claims, Plaintiff acted on Defendant's stated position. She submitted a claim through Defendant's Solution Channel and, on July 23, 2026, filed a Demand for Arbitration with the American Arbitration Association under the Employment Arbitration Rules. The AAA assigned Case No. 01-26-0004-5320. The filing receipt is attached as Exhibit B.

39. In response to her Solution Channel submission, Defendant informed Plaintiff that Defendant would review her claim and determine whether it is eligible for arbitration. That response reserves to Defendant, rather than to the arbitrator, the question of arbitrability, in direct conflict with Sections B.3 and I.1 of Defendant's own agreement and with the delegation principles of Henry Schein. Nor can Defendant cast its demand as enforcement of an agreed procedure. The only prerequisite the Agreement itself imposes is Section F's requirement that a written claim be submitted through the Solution Channel website, and Plaintiff submitted one. The waiting periods and eligibility review Defendant invoked appear only in the subordinate Guidelines, which yield to the Agreement under Section M. And even if those steps were valid procedural preconditions, the Supreme Court has held that compliance with procedural preconditions to arbitration is presumptively a question for the arbitrator to decide, not for the opposing party to adjudicate for itself. BG Group plc v. Republic of Argentina, 572 U.S. 25 (2014). Whether Plaintiff's AAA filing was premature was a question for the arbitral forum Defendant was obligated to help convene, not a license to demand the filing's withdrawal.

40. On or about July 27, 2026, Plaintiff served Defendant and Defendant's counsel by certified mail with copies of her completed AAA filing (Exhibit B) and the arbitration agreement (Exhibit D), as AAA requires.

41. Within days, Defendant's outside counsel at Thompson Coburn LLP sent Plaintiff a written demand that she withdraw her AAA filing, asserting that the filing was noncompliant because Plaintiff had not first completed Defendant's internal Solution Channel process, and stating that counsel would advise AAA that the case should be dismissed. A copy of counsel's demand is attached as Exhibit C.

42. Under Section H of the agreement (Exhibit D), Defendant's obligation upon the submission of a claim is affirmative: within 45 days, Charter requests from the AAA a list of at least five arbitrators willing to hear the dispute, and the parties select one within 20 days after receipt of the list. Defendant's required next step under its own contract was to advance the arbitration Plaintiff had commenced. Its counsel's demand did the opposite.

43. The demand was issued days before August 3, 2026, the expiration of Plaintiff's ninety day window to sue (Exhibit E). Had Plaintiff complied and withdrawn her filing while Defendant reviewed eligibility at its leisure, her claims could have lapsed entirely. Whether by design or by indifference, a withdrawal demand timed against a pro se claimant's limitations deadline operates as an attempt to run out her clock.

44. Nor was the demand a misunderstanding by junior staff. It issued from a senior partner at Defendant's outside counsel, on behalf of a sophisticated respondent whose own position statement had declared arbitration mandatory beyond question. In a single letter, Defendant treated the agreement as revocable at Defendant's option, contrary to 9 U.S.C. Section 2; inserted a gatekeeping prerequisite in front of the arbitral forum, contrary to 9 U.S.C. Section 4, Preston v. Ferrer, and Henry Schein; refused the affirmative step Section H of its own contract required; seized for itself the arbitrability questions that Sections B.3 and I.1 assign solely to the arbitrator; elevated Solution Channel procedure over the agreement in defiance of Section M; committed the material breach that Section K defines; and acted inconsistently with the right to arbitrate within the meaning of Morgan v. Sundance. Plaintiff is aware of no innocent construction of that letter, and Defendant's own documents leave room for none.

45. Defendant cannot have it both ways. Its conduct demonstrates either that no enforceable arbitration agreement exists, or that Defendant has materially breached and waived whatever agreement exists. Either way, Defendant, not Plaintiff, is responsible for the fact that this dispute is before this Court.

## D. Plaintiff's Employment and Accommodations

46. Plaintiff has worked for Defendant since May 24, 2019. Defendant has stated in writing that her performance is satisfactory. She worked in Defendant's office from her hire until the March 2020 closure without difficulty, was among the call center's top performers, and trained other employees. Her need for accommodations arose only with the conditions that developed during her employment.

47. Plaintiff has a chronic medical condition and is an individual with a disability within the meaning of the ADA. Her earliest paperwork, from October 2021, was submitted while her conditions were still being diagnosed and left their duration open. Since March 2023, however, her treating physician has documented the conditions as chronic and of lifetime duration continuously and in writing: in the March 2023 provider form (attached as Exhibit G), in the July 2024 recertification, in his February 2025 letter (attached as Exhibit F) following a January 9, 2025 examination, in the March 2025 resubmission, and in the April 2026 paperwork and his May 2026 confirming letters.

48. Plaintiff's disabling conditions developed during her employment. In December 2020 she underwent surgery to remove her ovaries, and between March 2020 and December 2021 she contracted COVID-19 four times. Her conditions include asthma, with flares that occur unpredictably wherever she is and that are severely aggravated by the office environment. Under the ADA as amended, an impairment that is episodic is a disability if it would substantially limit a major life activity when active. 42 U.S.C. Section 12102(4)(D). A disability that develops during employment is fully protected, so Defendant's observation to the EEOC that Plaintiff indicated no disability on her 2019 application is beside the point: it was true in 2019 and stopped being true during her employment with Defendant. At all relevant times, Plaintiff told Defendant exactly when and why her conditions arose, so Defendant has never had any basis for surprise about their onset. The ADA permits an employer to invite disability self identification from applicants only on a voluntary basis and for benign purposes. It does not convert a truthful 2019 answer into a weapon against conditions that developed afterward, and Defendant's decision to brandish that answer before a federal agency, against an employee who was forthcoming from the day her conditions began, illustrates the categorical mindset that runs through the rest of its conduct.

49. Plaintiff first requested a reasonable accommodation in October 2021. By Defendant's own account to the EEOC, that first approval ran only until February 2022, approximately four months, at which point Defendant required recertification. On information and belief, Plaintiff recertified approximately every three months through 2022, including the October 2022

submission that Defendant lost; the precise number and dates of her submissions are recorded in Defendant's own accommodation file, which Defendant produced to the EEOC as an exhibit exceeding one hundred pages. The paperwork burden this one employee has carried is thus documented by Defendant itself, at book length. Since 2021, Defendant has approved intermittent unpaid leave in amounts ranging from 6 to 12 days per month and has required Plaintiff to recertify as often as every three to six months despite possessing medical documentation that her condition is permanent. Recertification demands of that frequency for a documented permanent condition are disability related inquiries that must be job related and consistent with business necessity, and they are neither. 42 U.S.C. Section 12112(d)(4)(A).

50. The documentation of permanence is not merely in Plaintiff's possession; it is in Defendant's. The March 2023 provider form describing Plaintiff's conditions as chronic, with flares that could be lifelong, appears in Defendant's own accommodation file (Exhibit G), the same file Defendant submitted as an exhibit to the EEOC, and her 2025 and 2026 physician letters repeat it (Exhibits F and K). Yet when Defendant argued to the EEOC that the duration of Plaintiff's conditions was unclear, every record citation Defendant offered pointed to her October 2021 paperwork, from the period before her conditions were diagnosed, and not one pointed to the years of contrary documentation sitting in Defendant's own exhibit. Defendant did not lack the evidence of permanence. It possessed it, produced it, and argued around it.

51. The intermittent leave Defendant approved is unpaid. It is not a benefit Plaintiff enjoys; it is time without wages that her physician certifies she medically requires. Plaintiff first exhausts her accrued paid time off, which her disability consumes, so that the paid leave her coworkers spend on vacations Plaintiff spends on being ill, and only then does she use the unpaid days. Each unpaid day already costs her a day's wages. Defendant then reduces her commissions on the work she actually performed in the same month, so the accommodation as Defendant administers it costs Plaintiff three times over: the unpaid day, the paid leave consumed by illness, and the repriced commissions. Remote work does not eliminate the need for the leave. Plaintiff's flares occur even at home, and she cannot perform her duties during one. What remote work does is prevent the

aggravation the office causes, aggravation that in 2023 escalated to breathing treatments taken in Defendant's own Human Resources office and an emergency room visit, and it is what allows Plaintiff to work as much as she does. An employer earns no credit under the ADA for approving the accommodation that costs the employer nothing and the employee the most, while refusing the one that would reduce the need for leave at all. The statute entitles a qualified employee to reasonable accommodation; it does not make an accommodation a favor for which the employee owes gratitude, or wages.

52. Plaintiff remains employed by Defendant, and Defendant has suggested to the EEOC that her continued employment and continued remote work resolve the matter. They do not. The ADA prohibits discrimination in compensation, terms, conditions, and privileges of employment, not merely in hiring and firing. 42 U.S.C. Section 12112(a). The Supreme Court has confirmed that a plaintiff need show only some harm to an identifiable term or condition of employment, not significant harm and not discharge. Muldrow v. City of St. Louis, 601 U.S. 346 (2024). Plaintiff's harm recurs every pay period in which her earned commissions are repriced, every cycle in which her medical privacy is invaded anew, and every month her accommodations are held hostage to a process Defendant restarts at will. An employee is not required to lose her job before the law will notice what her employer is doing to it, and the statute does not ask her to be grateful for the parts of it her employer has not yet taken.

53. Defendant has repeatedly lost Plaintiff's accommodation paperwork. In March 2023, Defendant's Human Resources Manager could not locate Plaintiff's October 2022 recertification paperwork and Plaintiff was required to resubmit everything. The July 2024 loss described below was the second such loss.

54. Plaintiff has worked from home since March 2020, when Defendant closed its Cayce call center. Defendant has since reopened the call center but has left Plaintiff working remotely based on her performance, and a substantial number of her coworkers also work remotely.

**E. Defendant's Categorical Refusal to Consider the Work From Home Accommodation**

55. In February 2023, Defendant recalled Plaintiff to the office, citing her mobile phone sales numbers. Once back in the office environment, Plaintiff's asthma was aggravated to the point that she was performing breathing treatments in Defendant's own Human Resources office, in view of Defendant's personnel, and during that same period she was treated in the emergency room for her inability to breathe. That experience revealed the office environment as a severe aggravator of her condition. Her physician accordingly requested work from home as a medical accommodation in March 2023, together with intermittent leave. Plaintiff nonetheless remained in the office from February 2023 until early July 2023, months after that request, and was returned to remote work only when she requalified for it on merit. Defendant made her earn her way out of the environment that was harming her. Defendant thus treated Plaintiff's physical work location, on both ends, as a sales performance lever rather than as the medical question the ADA requires it to be.

56. Defendant's duty did not wait for paperwork. The ADA requires no magic words: the interactive process is triggered when the employer has enough information, from any source, to know of both the disability and the need for accommodation, Taylor v. Phoenixville School District, 184 F.3d 296, 313 (3d Cir. 1999); accord Kelly v. Town of Abingdon, 90 F.4th 158, 167 (4th Cir. 2024) (no magic words required), a request may come from a physician or other representative on the employee's behalf, and an employer confronted with an obvious disability is charged with the duty to accommodate whether or not the employee has asked. Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 135 (2d Cir. 2008) (employer must accommodate where it knew or reasonably should have known of the disability); see Wilson v. Dollar General Corp., 717 F.3d 337 (4th Cir. 2013); Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1285 (7th Cir. 1996) (if it appears the employee may need an accommodation, the employer should do what it can to help). The EEOC's regulations reflect the same principle: extensive medical proof may be required only where the need for accommodation is not obvious. 29 C.F.R. Part 1630, Appendix, Section 1630.9. In February and March 2023, Defendant did not merely have reason to know. It watched. Plaintiff performed breathing treatments inside Defendant's own Human Resources office, in view of the very personnel who administer its accommodation process, and during the

same period she was treated in an emergency room for her inability to breathe. From that moment Defendant possessed direct, firsthand knowledge that the office environment was disabling Plaintiff, and its obligation was to initiate the interactive process on its own and to consider interim relief while any review proceeded, including the temporary work from home that Defendant's own Human Resources Manager has since acknowledged Charter provides to other employees while reviews are pending. Defendant instead initiated nothing, offered nothing on an interim basis, left Plaintiff in the environment that was visibly harming her from February until early July 2023, and made her sales numbers, not her medical condition, the ticket out. Unnecessary delay in providing a reasonable accommodation may itself violate the Act, 29 C.F.R. Part 1630, Appendix, and a company that watches an employee take breathing treatments in its Human Resources office and responds with silence has not merely delayed the process. It has refused to begin it.

57. On May 12, 2023, Defendant's Human Resources Manager Jill Wall denied in writing Plaintiff's physician supported request that remote work be recognized as a reasonable accommodation, stating that working from home is a privilege for top performers, as shown in Exhibit H. Defendant conducted no individualized assessment and has never asserted that the accommodation would impose an undue hardship. A denial resting on status as a privilege, rather than on any assessment of the disability or of hardship, is not the individualized determination the ADA requires. 42 U.S.C. Section 12112(b)(5)(A); 29 C.F.R. Section 1630.2(o)(3).

58. Plaintiff renewed the request in January 2024, July 2024, February 2025, March 2025, and April 2026. Defendant has never evaluated the request through the interactive process, even though Plaintiff has performed every essential function of her position from home since March 2020.

59. A Charter manager told Plaintiff that Defendant avoids evaluating her work from home request because granting it would set a precedent recognizing work from home as a reasonable accommodation that Defendant could be required to provide. Defendant's refusal is therefore categorical and policy driven, not the individualized assessment the ADA requires. The Supreme

Court has held that the ADA requires precisely what Defendant fears: reasonable, individualized exceptions to neutral policies. US Airways, Inc. v. Barnett, 535 U.S. 391 (2002).

60. Consistent with that categorical position, in April 2025 Defendant's Human Resources leadership stated that Charter is not a very remote work friendly organization and that a treating physician's recommendation does not mean Defendant has to accommodate what the employee is asking, and acknowledged that Plaintiff's request and any alternatives had never been discussed with Plaintiff's physician. Defendant's representatives characterized the request as a future accommodation because Plaintiff already works from home on merit, pronounced the denial final, and confirmed that Plaintiff has spent only approximately thirteen months in the office since 2019.

61. Defendant's categorical approach is not new, and Defendant has been on notice that it is unlawful. In EEOC v. Charter Communications, LLC, 75 F.4th 729 (7th Cir. 2023), the United States itself sued Defendant for failing to accommodate a disabled call center employee. Defendant had granted the employee a temporary schedule accommodation, then refused to extend it, identified no undue hardship, offered no explanation for why a request granted weeks earlier had suddenly become unreasonable, and took the categorical position that the ADA imposed no obligation at all. The court of appeals reversed the judgment Defendant had obtained below and rejected Defendant's categorical rule. The conduct alleged in this Complaint follows the same template: an accommodation granted, then treated as unreasonable without explanation; a categorical refusal in place of an individualized assessment; and no undue hardship ever identified. A federal court of appeals put Defendant on notice in 2023, during the very period Defendant was applying this approach to Plaintiff, and Defendant's persistence in it is evidence of the malice or reckless indifference to federally protected rights that supports punitive damages under 42 U.S.C. Section 1981a(b)(1).

62. Plaintiff's physician requested both accommodations together: intermittent leave and work from home. Defendant granted the intermittent leave and simply ignored the work from home request. No decision document exists stating that work from home was denied and that intermittent

leave was being provided in its place. The request was not evaluated and substituted; it was disregarded.

63. Defendant has since told the EEOC that Plaintiff's work from home claim is moot because she is already allowed to work from home as a performance award, implying that the accommodation question would ripen only if she were ever recalled to the office. That contingency has already occurred, and Defendant has already answered it. Defendant recalled Plaintiff herself to the office in February 2023 over her mobile phone sales numbers, her condition worsened in the office, her physician requested work from home as a medical accommodation in March 2023, and on May 12, 2023 Defendant denied the request in writing as a privilege for top performers (Exhibit H). The future consideration Defendant now promises is one it has already refused.

64. Defendant's treatment of Plaintiff during the 2023 recall also stands apart from its treatment of others. On information and belief, other employees subject to the same return to office directive were permitted to continue working remotely, or simply did not return, without consequence, while Plaintiff, who complied, sickened, and produced a physician's request, was kept in the office from February to July 2023 and told that working from home is a privilege for top performers. Defendant's own Human Resources Manager has since acknowledged the disparity, on a call that Defendant itself recorded, as the Manager announced at the outset. On that call, the Manager acknowledged to Plaintiff that Charter has approved work from home as an accommodation for other employees when necessary, including temporary work from home while a review is pending, and that the process could be streamlined. In the same conversation, the Manager asserted that Charter is not really a remote company, comparing it to an insurer whose positions are expressly labeled remote, and maintained that Charter need not review Plaintiff's work from home request because Plaintiff already works from home on merit. In a single recorded conversation, Defendant's manager thus confirmed that the accommodation exists at Charter for others and refused to review it for Plaintiff. Defendant's own recording of that call is in Defendant's possession and must be preserved. If work from home has been approved for others, then Defendant's May 2023 denial and its years of refusal even to evaluate Plaintiff's request were

choices about this employee, not policy about the accommodation, and Defendant's representation to the EEOC that intermittent leave served as a substitute is exposed accordingly.

65. Working from home at Defendant's discretion is not the accommodation Plaintiff requested. A discretionary performance award may be revoked at any time and is conditioned on the very performance metrics that Defendant's commission plan degrades when Plaintiff uses her approved disability leave. Living under a revocable privilege means living under the standing possibility of being returned, on Defendant's timetable, to the environment that sent her to the emergency room in 2023, and that insecurity is itself a harm the requested accommodation would end. What Plaintiff seeks is the guarantee that her health, and not her sales metrics or Defendant's discretion, decides where she works. Federal law does not obligate Defendant to grant the request. It obligates Defendant to consider the request through a good faith interactive process and, if it denies the request, to demonstrate that the accommodation would impose an undue hardship on the operation of its business. 42 U.S.C. Section 12112(b)(5)(A); 29 C.F.R. Section 1630.2(o)(3). In more than three years, Defendant has done neither.

66. On information and belief, Defendant uses log-on metrics in determining which employees remain eligible for merit based remote work, and employees who fall short of those metrics are required to work in the office. Yet Plaintiff has consistently ranked at or near the top of her call center for remote work eligibility, notwithstanding the same approved leave that Defendant says drags her below the commission threshold. If the same log-on measure governs both, Defendant's administration is irreconcilable: the protected leave that supposedly disqualifies her earnings somehow never disqualifies her remote work standing. Either Defendant excludes her protected leave when it calculates remote work eligibility, which proves that such exclusion is feasible and is simply withheld from her paycheck, or Defendant applies its metrics selectively to produce the outcomes it prefers. Defendant's threshold calculations, which discovery will produce, will show which.

**F. The Commission Plan and Withholding of Earned Wages**

67. Plaintiff earns commissions on sales she personally enters while logged on and actively working. Commissions are wages within the meaning of S.C. Code Ann. Section 41-10-10(2).

68. Defendant applies a log-on threshold to commission calculations. When Plaintiff's approved intermittent leave reduces her average log-on percentage below the threshold in a month, Defendant moves her to a lower commission tier and applies the lower rate retroactively to the entire performance period, including to commissions on sales Plaintiff personally entered while actively working.

69. On information and belief, a log-on threshold or similar attendance based reduction was applied to Plaintiff's commissions before the commission plan effective December 29, 2023, and has been applied continuously since. Plaintiff began using ADA intermittent leave in 2022.

70. Employees who are absent on paid leave, such as vacation or sick time, are not penalized by the log-on threshold and keep the commissions they earn. Employees using ADA protected leave, which is unpaid by its nature, lose earned commissions. Plaintiff does use her accrued paid time off; her disability consumes it, and once it is exhausted the only leave left is the unpaid ADA leave the plan penalizes. A non disabled employee spends paid leave on vacation and keeps every commission. Plaintiff spends hers on illness and is then penalized for the illness that outlasts it. In practice, employees rarely fall below the threshold without an approved accommodation, because absences of that magnitude without paid or protected leave generally result in termination. The penalty therefore falls almost exclusively on employees using disability accommodations. Standards, criteria, and methods of administration that have that effect are unlawful whether or not intent is shown. 42 U.S.C. Section 12112(b)(3) and (b)(6).

71. Under the plan's own terms, a participant is not actively employed only if absent without management approval or without using accrued paid leave. Every ADA absence Plaintiff took was approved by management. Under the plan's own definition, Plaintiff was actively employed at all relevant times, and the plan's language provides no basis for repricing an entire month of earned commissions.

72. Plaintiff never signed any writing agreeing that Defendant could reduce commissions she had already earned, and Defendant never gave Plaintiff the written notice required by S.C. Code Ann. Sections 41-10-30 and 41-10-40 before applying these reductions.

73. Plaintiff raised the pay practice internally up to Defendant's Vice President of Human Resources and asked that her approved ADA leave be coded so that it would not trigger the reduction. Defendant refused, while acknowledging that its systems have the capability to treat approved leave in a manner that does not reduce commissions. Refusal to deploy an available correction supports a finding of malice or reckless indifference to federally protected rights within the meaning of 42 U.S.C. Section 1981a(b)(1).

74. The precise amount of the wages withheld is calculable only from Defendant's own records, including commission statements, tier assignments, log-on threshold values, and stack ranking reports for every pay period from the beginning of Plaintiff's ADA leave usage to the present. Plaintiff seeks recovery for every reduction Defendant applied within the limitations period and on a continuing basis, including any reductions predating the December 2023 plan, in an amount to be established at trial from Defendant's records.

### G. Protected Activity and Retaliation

75. In November 2024, Plaintiff complained in writing to Defendant's Chief Executive Officer and a Vice President that the commission plan discriminates against employees who use disability leave. In the same month, Plaintiff filed a wage complaint with the South Carolina Department of Labor, Licensing and Regulation. Defendant was served with that complaint on or about January 2025, with a response due at the end of February 2025. On April 4, 2025, Plaintiff filed an EEOC Charge (Exhibit I) alleging disability discrimination and retaliation. All three actions constitute protected activity under 42 U.S.C. Section 12203(a). Plaintiff herself told Defendant's Human Resources personnel and her supervisor that she had filed the wage complaint, in addition to the formal service on Defendant. Before that complaint, recertification had been routine for years and Plaintiff's physician documentation was accepted without incident, with only

brief physician input required. After service, identical documentation became insufficient and the process turned adversarial.

76. Plaintiff had submitted recertification paperwork in July 2024. Defendant approved it effective through January 24, 2025, but never told Plaintiff. Months of silence after a submission was not unusual; it was Defendant's own established pattern. Plaintiff's October 2022 recertification was not resolved until May 2023, after Defendant lost the paperwork, and the July 2024 submission likewise produced no response for the rest of the year. Having twice watched Defendant take months to process her paperwork, Plaintiff reasonably understood Defendant's silence as review still pending, not as an expiration no one had announced. Any suggestion that this interval reflects delay or obstruction by Plaintiff inverts the record: the silence was Defendant's, and the silence was Defendant's habit. Plaintiff learned of the purported expiration only when she asked about her pay in January 2025. On February 4, 2025, a Charter Vice President admitted to Plaintiff in a written WebEx exchange that her July 2024 paperwork had gone into a black hole during Charter's computer system conversion. Defendant then produced a document dated February 4, 2025, retroactively approving the July 2024 paperwork. In its June 19, 2025 position statement to the EEOC (Exhibit A), Defendant characterized the black hole incident speculatively, as though Plaintiff had merely alleged or claimed it occurred. Defendant did not disclose that its own executive had confirmed it in writing to Plaintiff. Defendant's mischaracterization of a documented fact as unsubstantiated speculation is evidence that Defendant's EEOC responses cannot be credited.

77. Defendant then required Plaintiff to recertify again. Plaintiff resubmitted the same paperwork Defendant had just approved, together with a new letter from her physician (Exhibit F) confirming a January 9, 2025 examination and dated February 17, 2025. Defendant's own fax records confirm receipt of that letter, yet Defendant questioned whether it genuinely came from her physician's office, though it plainly did, and omitted the letter itself from the exhibits it submitted to the EEOC. Defendant deemed insufficient the very documentation it had approved two weeks earlier, and refused to tell Plaintiff what was deficient despite her repeated requests for

clarification. When Plaintiff asked why paperwork that was sufficient on February 4 had become insufficient on resubmission, Defendant's personnel answered that they did not know, that the prior approvals had been a courtesy, and that Defendant needed more information. An approved ADA accommodation is a statutory entitlement, not a courtesy, and Defendant would repeat that characterization in 2026. During the same period, a Defendant Human Resources Director directed Plaintiff toward FMLA and told her she could not file for ADA accommodations again, relenting only after Plaintiff objected. This was the milder first iteration of a demand Defendant would escalate in 2026 with a written termination threat. Telling an employee she cannot request an ADA accommodation, and routing her instead into a different statute's process, is a refusal to engage in the interactive process required by 29 C.F.R. Section 1630.2(o)(3) and interference with the exercise of ADA rights prohibited by 42 U.S.C. Section 12203(b).

78. The escalating burden placed on Plaintiff's physician, timed to protected activity, demonstrates retaliation by pattern. In March 2023, before any protected activity, Plaintiff's physician completed Charter's own standard provider questionnaire with brief handwritten responses, a representative page of which is attached as Exhibit G, describing her conditions as chronic with flares that could be lifelong, and Defendant accepted that documentation without objection and approved the accommodations. The escalation began within weeks of Defendant being served with Plaintiff's November 2024 wage complaint. In February 2025, Defendant deemed insufficient the very paperwork it had approved on February 4, 2025, the same July 2024 documentation resubmitted together with an updated letter from her physician (Exhibit F), refused to identify what was missing, questioned whether the physician's letter was genuine, and cancelled her accommodations outright. In September 2025, after the EEOC charge and the February 2025 cancellation, Defendant cut the recertification window in half, approving only three months instead of the six month cycles that had preceded it, with an expiration date of December 24, 2025, and extended the approval to March 2026 only when Plaintiff asked. By 2026, the same chronic conditions required a recertification packet of roughly twelve pages, a written clarification demand from Defendant's Employee Services Center dated May 22, 2026 (Exhibit J) directing her

physician to supply estimated durations for the requested breaks and intermittent leave by June 1, 2026, and two separate confirming letters from her physician in May 2026, including his May 27, 2026 letter (Exhibit K) restating that Plaintiff requires intermittent leave of approximately 8 to 12 days per month and that the condition is ongoing with no expected end date. Physician responses that Defendant accepted without a single follow up question in 2023 became, after Plaintiff's protected activity, the subject of interrogation, deadlines, and repeated demands for confirmation of the same unchanged conditions. At every stage the conditions were the same and the physician was the same. What changed was Plaintiff's protected activity, and Defendant's paperwork demands tracked it. That is retaliation operating through the paperwork process itself.

79. On February 19, 2025, while Plaintiff's requests for clarification sat unanswered, Defendant faxed Plaintiff's physician a letter listing six specific items of information it wanted, with a deadline of February 26, 2025. Defendant never disclosed the list or the deadline to Plaintiff. On February 27, 2025, one day after that deadline and one day before Defendant's response to Plaintiff's wage complaint was due, Defendant answered Plaintiff's pending requests for clarification not with an answer but with a cancellation: it cancelled the recertification and revoked accommodations that had been in place for more than three years, two weeks after approving the very paperwork it now called insufficient. The same Human Resources Director had told Plaintiff in writing that very month that she had a grace period and could proceed business as usual while the recertification was pending. Concealing from the employee the very information said to be missing is the opposite of the interactive process required by 29 C.F.R. Section 1630.2(o)(3), and under the authority Defendant itself invoked before the EEOC, the party that fails to clarify bears the consequences. Hoppe v. Lewis University, 692 F.3d 833 (7th Cir. 2012). The party that withheld clarification here was Defendant.

80. During this period, Defendant recorded more than twenty attendance violations in Plaintiff's file and instructed her supervisor not to tell her. The records state that the supervisor discussed each violation with Plaintiff. Those conversations never occurred, and the supervisor

confirmed to Plaintiff that he had been instructed to document Plaintiff's attendance without notifying her. Defendant nonetheless submitted those records to the EEOC as fact.

81. The February 2025 cycle stands alone in Defendant's own history. In every recertification cycle before it, Plaintiff's accommodations remained in force while Defendant's review was pending, and business proceeded as usual. Defendant's backdated approvals concede as much: each one retroactively covered months during which Plaintiff was using her accommodations while review was pending, including the July 3, 2026 approval backdated to be effective April 1, 2026. Defendant's own ADA personnel confirmed to Plaintiff that revocation during recertification was contrary to every prior cycle. The February 2025 cycle, which began immediately after Defendant was served with Plaintiff's wage complaint, is the only cycle Defendant has ever handled differently: coverage revoked mid review, attendance tracked in secret, more than twenty violations recorded on conversations that never occurred. In 2026, after the EEOC charge, Defendant returned to covering the review period. Defendant's own conduct thus proves that continued coverage during recertification was always available; it was withheld exactly once, in the window immediately following Plaintiff's protected activity. A departure from an employer's own established practice, timed to protected activity, is evidence of retaliation, and Defendant's inconsistency, coverage honored in some cycles, revoked in one, restored by backdating in the next, with review windows shifting between three and six months, deprived Plaintiff of any reliable understanding of her own status and is itself evidence of an interactive process run in bad faith.

82. Plaintiff filed her EEOC Charge on April 4, 2025 (Exhibit I). Shortly after the filing, Defendant approved accommodations again, but only the intermittent leave, increased to 8 to 12 days per month. The work from home request was ignored once more, and that same month Defendant's Human Resources leadership pronounced the work from home denial final.

83. In September 2025, Defendant required Plaintiff to recertify again and approved the recertification for only three months, expiring December 24, 2025. Defendant's recent cycles had run approximately six months, including the July 2024 approval effective through January 24,

2025. Cutting the window in half, immediately after the February 2025 cancellation and Plaintiff's EEOC charge, doubled the frequency of Defendant's medical inquiries into conditions its own records describe as chronic and lifelong. Plaintiff had to request an extension, and Defendant extended the approval only to March 23, 2026, the expiration from which the 2026 events described below unfolded.

84. In March 2026, when Plaintiff sought to recertify accommodations expiring March 23, 2026, Human Resources Director Jeff Lichty told her the process must start over, that her prior records could not be used, that her four years of ADA accommodations had been a courtesy, and that she must first open an intermittent FMLA claim through Defendant's third party administrator, Sedgwick. When Plaintiff called Sedgwick as instructed, Sedgwick told her that ADA matters are handled internally by Charter and sent her back to Defendant. On March 27, 2026, Lichty attempted to open an FMLA claim on Plaintiff's behalf without her consent. Requiring an FMLA filing through a third party administrator as the gateway to the ADA process, and dismissing four years of accommodations as a courtesy, violated 29 C.F.R. Section 825.702 and the interactive process obligation of 29 C.F.R. Section 1630.2(o)(3). An accommodation approved under the ADA is a legal entitlement, not a courtesy Defendant may withdraw or recharacterize.

85. On April 1, 2026, Lichty stated in writing (Exhibit L) that not following that process could result in corrective action, up to and including termination of employment. The email spells out the gate in Defendant's own words: Plaintiff was to contact Sedgwick and request an intermittent leave of absence, Sedgwick would confirm her eligibility, and "If you are not eligible," Lichty wrote, "we will then take the accommodations route." The email then identifies Plaintiff's refusals as the offense: she had not contacted the leave administrator as directed, and when Lichty attempted to initiate the claim on her behalf, she "did not consent to proceed." Defendant thus threatened Plaintiff's employment, in writing, for declining to consent to the very FMLA filing its own EEOC position statement says twice she does not qualify for, routed through an administrator that had already told Plaintiff it does not handle ADA matters at all. A written termination threat, issued during an open EEOC matter, over a benefit the employee does not even qualify for, is

coercion, intimidation, threat, and interference with the exercise of rights protected by the ADA within the meaning of 42 U.S.C. Section 12203(b).

86. Defendant relented and opened the ADA process only after Plaintiff raised the issue with the Chief Executive Officer and the Vice President of Human Resources. Refusing to begin the ADA interactive process unless and until an FMLA claim is filed and denied violates the ADA's accommodation mandate, 42 U.S.C. Section 12112(b)(5)(A), and the governing regulation, which provides that FMLA and ADA obligations are wholly distinct, may run concurrently, and that the employer must honor whichever provides the greater protection. 29 C.F.R. Section 825.702. Conditioning the ADA interactive process on a prior FMLA filing inverts that rule, and a written termination warning issued for declining that unlawful precondition is coercion, intimidation, threat, and interference under 42 U.S.C. Section 12203(b). Defendant also stated in writing in April 2026 that Plaintiff's ADA process had been extended as a mistaken courtesy that was now ending, and when Plaintiff repeatedly asked what prevented Defendant from simply beginning the ADA interactive process, the answer she received was the written termination warning. On information and belief, routing employees who seek ADA accommodations into FMLA claims first is Defendant's standard practice, and it sets those employees up for failure by design. Lichty's April 1, 2026 email removes any doubt: "The processes laid out," he wrote, "are consistently applied for all employees" (Exhibit L). Defendant has thus admitted in writing that the FMLA first gate is not one director's error but Defendant's uniform policy. Yet that claim is contradicted on every side. Sedgwick itself told Plaintiff that ADA matters are handled internally by Charter. Lichty himself acknowledged the internal ADA process to Plaintiff in the March 27, 2026 meeting that his own email references in its opening line, a meeting also attended by Human Resources Manager Ashley Harris. And Charter's own conduct settles it: Plaintiff's accommodations were processed by Charter's internal ADA personnel for four years without any Sedgwick filing, and within weeks of Lichty's email, Charter's own Employee Services Center ADA unit was corresponding directly with Plaintiff and her physician about these very accommodations (Exhibit J). Either Lichty's statement is true, and Defendant has confessed a

uniform gate that violates 29 C.F.R. Section 825.702 as to every employee it touches, or it is false, and Defendant's Human Resources Director asserted a nonexistent company wide requirement in writing to justify a termination threat against an employee with an open EEOC charge.

87. Defendant has also demanded that Plaintiff's physician supply a projected end date for a condition Defendant's own records describe as chronic and lifelong, and one of Defendant's ADA representatives told Plaintiff that accommodations are meant to be temporary. Plaintiff's March 2026 recertification remained unresolved for months while these demands continued.

88. Only after weeks of the FMLA demands described above did Defendant open the interactive process Plaintiff had been requesting since March 10, 2026, and Plaintiff submitted her recertification paperwork in April 2026. Defendant then required a clarification letter from her physician, sent May 13, 2026, requesting a standing desk, remote work because the office worsens her condition, and intermittent leave of 8 to 12 days per month, followed by a second confirming letter the same month (Exhibit K). On June 3, 2026, Defendant approved only a sit stand desk and a secluded work area, for an office Plaintiff does not work in, omitting the intermittent leave her physician had confirmed twice and ignoring the remote work request entirely. Only on July 3, 2026, a month after Plaintiff wrote to Defendant's Chief Executive Officer, was the leave approved, with no explanation for the omission, with her request for a reduced concurrent chat load denied, and with an offered alternative of voice work that is worse for her asthma. The approval Defendant issued on July 3, 2026 was backdated to be effective April 1, 2026, and expires in October 2026. This is the second time Defendant has papered over its own delay with a backdated approval. Of the roughly six months the document purports to cover, three had already elapsed before it existed, leaving Plaintiff about three months of actual coverage before Defendant's recertification cycle begins again, for conditions Defendant's own file has documented as chronic since 2023. The EEOC's interpretive guidance recognizes that an employer's unnecessary delay in providing a reasonable accommodation may itself violate the Act. 29 C.F.R. Part 1630, Appendix. Defendant's pattern of loss, restart, omission, and expiration is delay by design.

## IV. FOR A FIRST CAUSE OF ACTION

## Declaratory Judgment, 28 U.S.C. Sections 2201 and 2202, and Order Under 9 U.S.C. Section 4 in the Alternative

89. Plaintiff realleges the foregoing paragraphs.

90. An actual, justiciable controversy exists between the parties concerning the formation, enforceability, and effect of the purported arbitration agreement, and that controversy must be resolved before the merits can proceed in any forum. These threshold questions belong to this Court notwithstanding the agreement's delegation clause. Whether an arbitration agreement was ever formed at all is always a question for the court, because a delegation clause in a contract that was never formed binds no one. Granite Rock Co. v. International Brotherhood of Teamsters, 561 U.S. 287 (2010). Whether a party has waived or forfeited arbitration through conduct inconsistent with the right to arbitrate is likewise resolved by the court, as it was in Morgan v. Sundance itself. The delegation clause matters in this case for a different reason: it is the very term Defendant violated when it seized arbitrability for its own internal review, and Defendant cannot invoke against Plaintiff the provision it refused to honor. Finally, should Defendant invoke the delegation provisions of Sections B.3 and I.1 to route these threshold questions to an arbitrator, Plaintiff challenges those delegation provisions specifically and not merely the agreement as a whole: they were never displayed or agreed to, along with the rest of a document Plaintiff never saw, and as Defendant administers them they are illusory, because Defendant claims for itself, through Solution Channel review, the very arbitrability determination those provisions purport to delegate. A challenge directed at the delegation provision itself is decided by the court. Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63 (2010). A delegation the drafting party treats as inoperative whenever an employee invokes it is not clear and unmistakable evidence of an agreement to arbitrate arbitrability; it is one more term that binds in one direction only.

91. First, Plaintiff seeks a declaration that Defendant has forfeited any right to enforce the arbitration agreement it claims. Defendant materially breached that agreement under its own Section K and waived and forfeited its enforcement by refusing to submit to the AAA arbitration

Plaintiff commenced and demanding its withdrawal, and that Defendant is estopped from compelling Plaintiff into any process other than the pending AAA arbitration. Under Morgan v. Sundance, Inc., 596 U.S. 411 (2022), a party that acts inconsistently with the right to arbitrate waives that right, and no showing of prejudice is required. Demanding withdrawal of a filed arbitration is the paradigm of acting inconsistently with the right to arbitrate, and Defendant's inconsistency runs deeper: it invoked the agreement before the EEOC to contain Plaintiff's discrimination charge, took the benefit of that invocation for a year, and then obstructed the arbitration when Plaintiff commenced it. This ground resolves Defendant's arbitration defense without the Court needing to decide whether any agreement was ever validly formed.

92. Second, and independently, Plaintiff seeks a declaration that no arbitration agreement was ever formed. Defendant bears the burden of proving formation, and it cannot: its click record does not establish that the full agreement was displayed or presented to Plaintiff, Plaintiff does not believe it was, the application record itself (Exhibit M) shows only a one paragraph summary embedded in an employment application, and Defendant's maintenance of multiple, materially different versions of the agreement, none shown to have been presented to Plaintiff, defeats any claim of mutual assent. Under Lampo v. Amedisys Holding, LLC, an acknowledgment and continued employment do not substitute for actual assent to terms never shown.

93. Third, and in the further alternative, Plaintiff seeks a declaration that the agreement is procedurally and substantively unconscionable and unenforceable. Procedurally, it is a contract of adhesion imposed as a condition of applying for a job, never negotiated and, Plaintiff alleges, never even displayed, and it is administered through Solution Channel Guidelines (Exhibit N) whose language is engineered to conceal from employees that arbitrability belongs to the arbitrator alone and that the arbitral forum can be reached at all except through Charter. Substantively, as the Supreme Court of California held in Ramirez v. Charter Communications, Inc., 16 Cal.5th 478 (2024), regarding this same agreement, it lacks mutuality between covered and excluded claims, shortens the limitations period, and carries a fee provision creating the potential for unlawful fee awards; and as Defendant's conduct here confirms, it operates one sidedly, with arbitration

mandatory for the employee while Charter reserves to itself the power to decide whether the employee's claims are eligible for arbitration at all.

94. Fourth, and in the final alternative, if arbitration is to proceed, Plaintiff seeks an order under 9 U.S.C. Section 4 and a declaration, consistent with Preston v. Ferrer, 552 U.S. 346 (2008), Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524 (2019), and Sections B.3, I.1, K, and M of the agreement, that no Solution Channel eligibility review or other internal prerequisite may delay or condition the arbitration, that AAA Case No. 01-26-0004-5320 (Exhibit B) shall proceed forthwith, that all questions of arbitrability are for the arbitrator, and that Defendant shall bear the AAA administrative fees, the arbitrator's fees and expenses, and Plaintiff's costs of compelling arbitration as Section K provides. This alternative is pleaded because Rule 8(d) of the Federal Rules of Civil Procedure permits alternative and inconsistent demands, and for no other reason. It is not a preference. Plaintiff's position is that no enforceable agreement exists and that Defendant forfeited whatever agreement existed; Plaintiff seeks trial by jury in this Court. If the Court nonetheless enforces the agreement over Plaintiff's objections, enforcement must come on the agreement's actual terms rather than the version Defendant has been practicing, and Defendant, as the party that resisted arbitration, must bear every cost of its own obstruction.

## FOR A SECOND CAUSE OF ACTION

### Breach of Contract, Pled in the Alternative

95. Plaintiff realleges the foregoing paragraphs.

96. In the alternative, if the arbitration agreement is found to be a valid contract, Plaintiff performed under it by submitting her claim and filing her Demand for Arbitration with AAA, the forum the agreement itself designates.

97. Defendant refused to submit to that arbitration and demanded its withdrawal (Exhibit C). Under Section K of the agreement (Exhibit D), Defendant's refusal constitutes a material breach, and Defendant is liable for all costs, fees, and expenses Plaintiff incurs in compelling arbitration, in addition to all damages flowing from the breach. Defendant's conduct also breached

the implied covenant of good faith and fair dealing that South Carolina law reads into every contract. The only benefit the agreement ever offered Plaintiff was access to a neutral forum, and Defendant exercised invented, extra contractual gatekeeping for the purpose of defeating that benefit. The breach was willful.

## FOR A THIRD CAUSE OF ACTION

### Disability Discrimination in Compensation, ADA, 42 U.S.C. Section 12112(a)

98. Plaintiff realleges the foregoing paragraphs.

99. Plaintiff is a qualified individual with a disability who performs the essential functions of her position with reasonable accommodations Defendant approved.

100. Defendant discriminates against Plaintiff in her compensation on the basis of disability by reducing commissions she earned while actively working because she used the disability accommodations Defendant approved. Defendant thereby classifies Plaintiff in a manner that adversely affects her compensation and employment status because of disability. 42 U.S.C. Section 12112(b)(1). No speculation is required to connect the reductions to disability, defeating the but for arguments Defendant advanced before the EEOC under Gentry v. East West Partners Club Management Co., 816 F.3d 228 (4th Cir. 2016), and Kelly v. Town of Abingdon, 90 F.4th 158 (4th Cir. 2024): the plan's own definition of actively employed excludes Plaintiff from the penalty clause, because every absence at issue was approved by management.

101. Defendant acted with malice or with reckless indifference to Plaintiff's federally protected rights, including by refusing to correct the practice after acknowledging it had the system capability to do so, entitling Plaintiff to compensatory and punitive damages under 42 U.S.C. Section 1981a(a)(2) and (b)(1).

102. Plaintiff has been damaged in the form of lost wages, to be calculated from Defendant's records, and emotional distress.

## FOR A FOURTH CAUSE OF ACTION

### Disparate Impact, ADA, 42 U.S.C. Section 12112(b)(3) and (b)(6)

103. Plaintiff realleges the foregoing paragraphs.

104. Defendant utilizes standards, criteria, and methods of administration, namely the log-on threshold and tier reduction applied to unpaid leave, that have the effect of discriminating on the basis of disability.

105. The practice falls almost exclusively on employees using approved disability accommodations, because employees on paid leave are exempt and employees absent without approval or paid leave are generally terminated.

106. The practice is not job related for the position in question and is not consistent with business necessity, as the commissions at issue were earned on sales entered while actively working.

## FOR A FIFTH CAUSE OF ACTION

### Failure to Accommodate and Failure to Engage in the Interactive Process, ADA, 42 U.S.C. Section 12112(b)(5)

107. Plaintiff realleges the foregoing paragraphs.

108. Defendant refused to evaluate Plaintiff's repeated, physician supported request for remote work as an accommodation, denied it in writing as a privilege rather than assessing it, and has never identified any undue hardship. Defendant's duty attached no later than February 2023, when its own Human Resources personnel observed Plaintiff performing breathing treatments in their office, and in all events upon her physician's written request in March 2023. No particular words or forms were required to trigger it, and an obvious disability triggers the duty without any request at all. Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 135 (2d Cir. 2008).

109. Defendant's refusal is categorical. A Charter manager told Plaintiff that Defendant avoids evaluating the request because granting it would set a precedent recognizing work from home as an accommodation, and Human Resources leadership stated that Charter is not a very remote work friendly organization. A blanket policy against considering an accommodation, applied without individualized assessment, is itself a failure to accommodate under the ADA.

110. The ADA places the burden on the employer: a requested accommodation may be refused only if the employer demonstrates that the accommodation would impose an undue hardship on the operation of its business. 42 U.S.C. Section 12112(b)(5)(A). Defendant has never made, or even attempted, that showing. Instead, Defendant has taken the position that it need not consider the request at all because Plaintiff already works from home as a discretionary performance award. A revocable perk, conditioned on metrics that Defendant's own commission plan degrades whenever Plaintiff uses her disability leave, is not the reasonable accommodation the statute contemplates, and a benefit held over an employee that can be withdrawn at will does not discharge the duty to accommodate.

111. Nor can Defendant rely on the alternative accommodation doctrine of the authorities it invoked before the EEOC, Hannah v. United Parcel Service, Inc., 72 F.4th 630 (4th Cir. 2023), and Clark v. School District Five of Lexington and Richland Counties, 247 F. Supp. 3d 734 (D.S.C. 2017), or on a promise of future consideration. Those cases presuppose an interactive process that occurred and an effective alternative that was actually offered; neither happened here. Plaintiff's physician requested both intermittent leave and work from home. Defendant granted the first and ignored the second, and no document anywhere records a decision denying work from home and substituting leave in its place, a substitution that was never discussed with Plaintiff's physician. The two accommodations address different limitations: leave responds to episodes after they occur, wherever Plaintiff is working, while remote work prevents the office aggravation that in 2023 escalated her asthma to an emergency room visit. Defendant's suggestion that it would consider the accommodation if Plaintiff were recalled to the office is a contingency Defendant has already refused: when Defendant recalled employees in 2023 and Plaintiff requested the accommodation, Defendant denied it in writing as a privilege for top performers (Exhibit H). Under Jacobs v. North Carolina Administrative Office of the Courts, 780 F.3d 562 (4th Cir. 2015), an employer's refusal to make a requested reasonable accommodation, together with its failure to engage in the interactive process in good faith, states a violation of the Act.

112. Defendant further revoked Plaintiff's long held accommodations in February 2025 while concealing from her the specific information it claimed to need, cancelled her recertification while written questions to her physician remained undisclosed to her, and conditioned the ADA process on a prior FMLA filing for which Defendant itself says she is ineligible, in violation of 29 C.F.R. Section 825.702. Under the documentation standard Defendant itself quoted to the EEOC, Allen v. City of Raleigh, 140 F. Supp. 3d 470 (E.D.N.C. 2015), the March 2023 provider form in Defendant's own file (Exhibit G) describes the nature, severity, and duration of the impairment and substantiates the need for the accommodations, and Defendant treated materially identical documentation as sufficient on February 4, 2025 and insufficient on February 12, 2025. The February 17, 2025 letter from her physician (Exhibit F) further confirms the conditions and medical need for accommodation, yet was questioned by Defendant as to its authenticity.

113. Defendant thereby failed to provide reasonable accommodation and failed to engage in the interactive process in good faith.

## FOR A SIXTH CAUSE OF ACTION

### Unlawful Medical Inquiries, ADA, 42 U.S.C. Section 12112(d)(4)(A)

114. Plaintiff realleges the foregoing paragraphs.

115. Defendant has demanded medical information that is neither job related nor consistent with business necessity, including recertification as often as every three to six months of a documented permanent condition and a projected end date for a condition its own records describe as chronic and lifelong.

116. These inquiries impose a requirement that only employees with permanent disabilities are unable to satisfy. Defendant compounds the violation by issuing approvals that expire within months, including a September 2025 approval limited to three months and expiring December 24, 2025, and most recently an approval issued July 3, 2026, backdated to be effective April 1, 2026, and expiring in October 2026, for conditions its own records have documented as chronic and lifelong since 2023, guaranteeing perpetual reinquiry into a settled medical fact. Even under the

authorities Defendant invoked before the EEOC, Myers v. Hose, 50 F.3d 278 (4th Cir. 1995), and Templeton v. Neodata Services, Inc., 162 F.3d 617 (10th Cir. 1998), updated inquiries are permitted only where genuine doubt exists about the employee's present condition; Defendant's own records since March 2023 foreclose that doubt. In Templeton itself, the employer's request for updated information was reasonable because the employee's own physician had written a letter creating real doubt about her ability to return to work. Plaintiff's physician wrote the opposite, year after year, in documents (Exhibits F and G) that sit in Defendant's own EEOC exhibits. Defendant's authority permits inquiries that resolve doubt; it does not license the manufacture of doubt that the employer's own file refutes.

117. These inquiries also inflict a distinct and foreseeable dignitary harm. An employer that repeatedly demands the date on which a permanently disabled employee will be cured is requiring her to restate, in writing, again and again, that she will never get well. Plaintiff was forthcoming about her conditions from their onset, her physician answered every legitimate question, and the demands continued anyway, on a three to six month cycle, for years. That is discrimination in its operation, not merely in its paperwork, and Plaintiff is entitled to compensatory damages for the distress these repeated and unnecessary inquiries inflicted.

## FOR A SEVENTH CAUSE OF ACTION

### Retaliation and Interference, ADA, 42 U.S.C. Section 12203

118. Plaintiff realleges the foregoing paragraphs.

119. Plaintiff engaged in protected activity by requesting accommodations, complaining to Defendant's executives in November 2024 that the commission plan is discriminatory, filing a wage complaint with the State of South Carolina in November 2024, filing an EEOC charge in April 2025, and filing a Demand for Arbitration of her ADA claims in July 2026.

120. Defendant thereafter took adverse actions against her, including declaring her accommodations expired, cancelling her recertification one day before its wage complaint response was due, secretly recording attendance violations containing accounts of conversations

that never occurred, limiting her September 2025 recertification to a three month approval, half the length of its prior cycles, threatening her employment in writing in April 2026, prolonging her 2026 recertification, and demanding, days before her federal filing deadline expired, that she withdraw the arbitration she had filed on her disability claims.

121. The timing and sequence of these actions establish a causal connection between Plaintiff's protected activity and Defendant's conduct. Defendant's own authority in the administrative proceedings, Hindman v. Greenville Hospital System, 947 F. Supp. 215 (D.S.C. 1996), holds that the causal connection for a retaliation claim can be established only if the protected activity preceded the retaliatory conduct. Every act alleged here clears that threshold: each postdates the protected activity it followed. Defendant's deviation from its own established practice of maintaining accommodations during recertification, in the single cycle that followed Plaintiff's wage complaint, and its return to that practice thereafter, is independent evidence of retaliatory intent. Retaliation does not require discharge: an action is materially adverse if it well might dissuade a reasonable worker from making or supporting a charge of discrimination, Burlington Northern and Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), and secret discipline, revoked accommodations, repriced pay, a written termination threat, and a demand to abandon a filed arbitration each meet that standard.

122. Separately and additionally, Defendant's written termination threat of April 1, 2026 (Exhibit L), its direction that Plaintiff open an FMLA claim its own filing says she does not qualify for, its attempt to open that claim without her consent, and its characterization of four years of accommodations as a revocable courtesy constitute coercion, intimidation, threats, and interference in violation of 42 U.S.C. Section 12203(b).

123. Defendant's obstruction of Plaintiff's arbitration is itself retaliation and interference. The claims in AAA Case No. 01-26-0004-5320 are ADA claims, and pursuit of a forum in which to vindicate ADA rights is itself an exercise of those rights. Section 12203(b) makes it unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of any right granted or protected by the Act. Defendant, through counsel, demanded that a disabled, pro se

employee withdraw a filed arbitration of her disability claims and resubmit them to Defendant's own eligibility review, with the demand timed against a limitations deadline known to counsel. Administered this way, Solution Channel operates against Plaintiff as one more process Defendant controls and deploys to exhaust her: the same design she experienced in recertification cycles restarted at will, attendance files kept in secret, and commissions repriced for approved leave, now applied to dispute resolution itself. An employer that gatekeeps a disabled employee's path to the only forum it says exists for her disability claims interferes with the rights that forum exists to vindicate, and the interference is aggravated, not excused, by the fact that Defendant designed and administers the gate.

**FOR AN EIGHTH CAUSE OF ACTION**

**South Carolina Payment of Wages Act, S.C. Code Ann. Sections 41-10-10 through 41-10-110**

124. Plaintiff realleges the foregoing paragraphs.

125. The commissions Defendant reduced are wages under S.C. Code Ann. Section 41-10-10(2), earned on sales Plaintiff personally entered while actively working.

126. Defendant withheld and diverted portions of Plaintiff's wages without being required or permitted to do so by law and without the written notice required by S.C. Code Ann. Sections 41-10-30 and 41-10-40, including the seven days written notice required before any change in wages.

127. Defendant's violations occurred in every pay period in which the log-on threshold or tier reduction was applied to Plaintiff's earned commissions, are continuing, and include periods before the December 2023 plan. Plaintiff seeks recovery for all such periods within the applicable limitations period and as tolled or extended by Defendant's continuing violations.

128. Pursuant to S.C. Code Ann. Section 41-10-80(C), Plaintiff is entitled to recover three times the full amount of the unpaid wages, plus costs and reasonable attorney's fees, in an amount to be established at trial from Defendant's own records.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

a. The declaratory relief and, in the alternative, the order compelling arbitration described in the First Cause of Action, resolved at the threshold of this case, including a declaration that no Solution Channel internal review, eligibility determination, or other gatekeeping by Defendant may be required of Plaintiff or condition her access to any forum;

b. Actual damages, including all commissions and wages withheld through application of the log-on threshold and tier reductions, in every affected pay period including those predating the December 2023 plan, in an amount to be calculated from Defendant's commission, payroll, tier assignment, and log-on records, together with prejudgment interest;

c. Treble damages on the unpaid wages pursuant to S.C. Code Ann. Section 41-10-80(C), plus costs and reasonable attorney's fees;

d. Compensatory damages for emotional distress and other nonpecuniary harm;

e. Punitive damages;

f. Equitable relief requiring Defendant to conduct an individualized assessment of Plaintiff's remote work accommodation request and, if denied, to state the specific undue hardship in writing; to limit recertification to once per year with no medical inquiries beyond those permitted by 42 U.S.C. Section 12112(d)(4); to keep accommodations in force while any recertification is pending; to cease applying the log-on threshold and tier reduction to periods of ADA protected leave, for Plaintiff and for all employees using approved disability accommodations, and to revise the commission plan accordingly; to adopt a written policy providing individualized assessment of remote work accommodation requests; to expunge all attendance violations accrued during ADA protected leave; and to revise the Solution Channel Guidelines to disclose to employees that arbitrability is decided solely by the arbitrator and that no internal review by Defendant is a prerequisite to arbitration;

g. Costs of this action, together with attorney's fees and costs under 42 U.S.C. Section 12205 and S.C. Code Ann. Section 41-10-80(C) should counsel appear for Plaintiff, and the costs,

fees, and expenses that Section K of Defendant's own agreement shifts to a party that resists arbitration; and

      h. Such other and further relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE. Fed. R. Civ. P. 38(b).**

## INDEX OF EXHIBITS

Exhibit A: Defendant's June 19, 2025 position statement to the EEOC, submitted by Thompson Coburn LLP, EEOC Charge No. 436-2025-00543.

Exhibit B: American Arbitration Association File Online receipt, Case No. 01-26-0004-5320, dated July 23, 2026.

Exhibit C: Written demand from Defendant's counsel, Thompson Coburn LLP, that Plaintiff withdraw her AAA filing.

Exhibit D: Mutual Arbitration Agreement, version dated September 25, 2017.

Exhibit E: EEOC Determination and Notice of Rights, Charge No. 436-2025-00543, issued May 5, 2026.

Exhibit F: Letter from Dr. David P. Lyle, MD, Lexington Family Practice, dated February 17, 2025, confirming Plaintiff's chronic medical conditions and continuing accommodation requirements following a January 9, 2025 office visit.

Exhibit G: Excerpt from Charter's health care provider questionnaire completed by Plaintiff's treating physician in March 2023, describing her conditions as chronic with flares that could be lifelong.

Exhibit H: Written message from Jill Wall, Defendant's Human Resources Manager, dated May 12, 2023, denying Plaintiff's physician supported work from home request and stating that working from home is a privilege for top performers.

Exhibit I: Plaintiff's Charge of Discrimination, EEOC Charge No. 436-2025-00543, filed April 4, 2025 and dual filed with the South Carolina Human Affairs Commission, including Plaintiff's supplemental statement.

Exhibit J: Clarification request from Yawa Akovi, Supervisor, Defendant's Employee Services Center, dated May 22, 2026, Request ID 1821164224, directing Plaintiff's physician to provide estimated durations for the requested breaks and intermittent leave by June 1, 2026.

Exhibit K: Letter from Dr. David P. Lyle, MD, Lexington Family Practice, dated May 27, 2026, responding to Defendant's clarification request and confirming intermittent leave of approximately 8 to 12 days per month with no expected end date.

Exhibit L: Email from Jeff Lichty, Defendant's Director of Human Resources, dated April 1, 2026, directing Plaintiff to initiate an intermittent leave of absence through Sedgwick before the accommodations route, and stating that not following the process could result in corrective action, up to and including termination of employment.

Exhibit M: Excerpt from Plaintiff's April 9, 2019 online employment application, showing the one paragraph arbitration acknowledgment presented on the same page as a veteran status question, the recorded response, and the automated form creation record.

Exhibit N: Charter Solution Channel Guidelines and appended Mutual Arbitration Agreement, version dated October 21, 2024.

Respectfully submitted,

Bobbie Dameron, Pro Se
910 Holland Avenue
Cayce, South Carolina 29033
(803) 708-3107
bobbiedameron@gmail.com

Cayce, South Carolina
August 3, 2026